IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CARL COPELAND,                        :
                                      :
          Plaintiff,                  :
                                      :
     v.                               :     CIVIL ACTION NO.
                                      :     1:03-CV-3854-JOF
CVS PHARMACY, INC.,                   :
                                      :
          Defendant.                  :


## OPINION AND ORDER

This matter is before the court on Defendant's motion for summary judgment [129-1];

the Report and Recommendation of Magistrate Judge Susan S. Cole [192-1]; and Plaintiff's

objections thereto [193-1].

I.     **Background**

       A.     **Procedural History**

       Plaintiff, Carl Copeland, an African-American male, filed suit against Defendant CVS

Pharmacy, Inc., on December 11, 2003, alleging that Defendant discriminated against him on

the basis of his race and retaliated against him in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §§ 2000e, *et seq.* and 42 U.S.C. § 1981.  Plaintiff alleges that Defendant

denied him promotions, assigned African-American store managers to "ethnic and high crime

neighborhoods," and "secretly selected" mid- and upper-level management employees in a

manner designed to deprive African-American employees of advancement opportunities. Plaintiff also alleges that his termination was discriminatory for the same reasons and in retaliation for his objection to the alleged discriminatory treatment of Felicia Dugger, an African-American assistant store manager, by Plaintiff's supervisor, Kent Sears.   Plaintiff asserted his claims under three theories:   (1) disparate treatment, (2) pattern and practice, and (3) disparate impact.   Although Plaintiff originally filed his suit on "behalf of himself and all other similarly situated persons," he later amended his complaint to strike any class allegations.

Discovery ended on January 30, 2006.   The parties thereafter filed briefings related to summary judgment and various evidentiary objections.   Magistrate Judge Susan S. Cole issued a Report and Recommendation on July 28, 2006, in which she recommends granting Defendant's motion for summary judgment.   Plaintiff filed a sixty-seven-page objection to the Report and Recommendation on August 14, 2006.   Defendant responded to Plaintiff's objections on September 6, 2006.

In her Report and Recommendation, Magistrate Judge Cole determined that Plaintiff's pattern and practice and disparate impact claims could not proceed because Plaintiff's statistical evidence did not show that the succession planning system used by Defendant was discriminatory.   With respect to Plaintiff's disparate treatment promotions claim, Magistrate Judge Cole assumed that Plaintiff could make out a prima facie case of discrimination but found that Plaintiff had not proffered evidence to show that his own qualifications were so

2

significant in comparison to the individuals selected that no reasonable person could have chosen the candidate selected over Plaintiff.

The Magistrate Judge also assumed that Plaintiff could make out a prima facie case of discrimination with respect to his termination.   However, she found that Plaintiff could not establish that Defendant's reasons for Plaintiff's termination were pretextual because even if Sears was wrong about   Plaintiff's lack of preparation for an inventory and improper markdown of merchandise, Plaintiff had not adduced any evidence to show that Sears did not have a reasonable good faith belief that such misconduct had occurred.

Magistrate Judge Cole found that Plaintiff could not establish a prima facie case of retaliation because he had not shown that his belief that Sears' treatment of Dugger was based on race was objectively reasonable.   Even if he could show this, Plaintiff's retaliation claim would ultimately fail for the same reasons as his termination claim – because Plaintiff could not demonstrate that Defendant's legitimate non-discriminatory reasons for his termination were pretextual.

### B.    Facts

The Magistrate Judge thoroughly discussed the facts of this case in her Report and Recommendation.   *See id*. at 10-30.   The court briefly summarizes and highlights additional facts relevant to Plaintiff's objections.   Plaintiff began working for Revco (Defendant's predecessor) in 1995 as a store manager at Store 4530 in Decatur, Georgia.   Plaintiff remained at that store until his termination in February 2002.   Plaintiff's district manager was

3

Kent Sears and his regional manager was Russ Dossey.   Defendant used a "succession planning" system which rated store managers in various performance areas, including communication, store presentation, people skills, customer service, organization administration, and overall performance, and then "force ranked" them against the other store managers in each district.  Plaintiff was repeatedly ranked in the bottom half of his district.

Felicia Dugger worked as the assistant store manager in Plaintiff's store.   Sears decided that he would transfer Dugger to a different store within the district and informed Dugger of this decision while at Plaintiff's store on January 14, 2002.   Plaintiff did not believe this was the appropriate place to have such a discussion and suggested that Sears and Dugger move their conversation to the back room where he joined them.   The talk became heated and at one point, Plaintiff testified that he told Sears, "you wouldn't stand in front of a white lady or white woman and treat her like you are treating this woman.  She is still a woman regardless of her color, and you're treating her with – this is not the way we treat our employees."

An inventory was scheduled for Plaintiff's store on January 25, 2002.   An inventory is a significant event for a store.   Certain preparations must be made in advance so that the inventory team can immediately begin work when they arrive at the store.   Merchandise on shelves must be faced a certain direction and must be completely and accurately labeled.

Although Sears set up a mandatory meeting for store managers the day before the inventory, Plaintiff had advanced notice of the inventory.   Warren Johnson, an African-

4

American store manager, testified that you were expected to be at the store manager meeting unless you were sick or on vacation or if you were doing inventory in your store. *See* Johnson Depo., at 55-56. Other than Plaintiff, Mr. Johnson did not know whether "Sears or other managers had asked managers [to] come to management meetings during a week when they had an inventory." *Id*. at 56. He could not name any manager who had been excused from a managers' meeting because of an inventory. *Id.* at 59-60. Plaintiff testified that he recalled a manager named Tom who worked in Conyers did not have to come to a managers' meeting because he was doing inventory. The same also applied to a manager named Stan Nobles. *See* Copeland Depo., at 133-36. Plaintiff, however, was uncertain as to whether these two individuals were excused during the time Sears was the supervisor. *Id.* at 141.

Another store in the district closed shortly before the inventory, and twenty-four boxes of merchandise from that store were delivered to Plaintiff's store on January 18, 2002, for Plaintiff to sort, stock, price, and sell. Defendant has a specific policy for the manner in which merchandise is to be marked down if it cannot be sold. After markdowns are taken, if the product still is not sold, it is to be "zeroed out," that is, marked as a price of zero, and destroyed so that it is not possible for anyone to remove it from a trash bin and attempt to get cash or store credit back for it. It is considered a "gross violation" of Defendant's policy to mark down regularly priced merchandise to zero without going through the graduated steps. A "gross violation" is one that can lead to immediate termination.

Charlene Glass, an African-American Assistant Store Manager, was assigned the task of distributing merchandise from the closed Decatur store.   *See* Hudson Depo., at 21-22. According to Glass, three to four weeks before the store closed, she began sorting merchandise into boxes for the other stores in the area.   *See* Glass Depo., at 51-53.   She would distribute some of each item to each store so that one store would not get all of one kind of merchandise.   *Id.*   Store managers could come to the store and take merchandise they thought they could sell immediately, and Glass would box up the rest of each store's merchandise to take to it when the store finally closed.   *Id.*   Plaintiff testified that he had gone to pick up merchandise from the closing store and did not think he was going to get any more merchandise because he was so close to inventory, but he then received twenty-four boxes of inventory on January 19, 2002. *See* Copeland Depo., at 171.

Plaintiff testified that he originally told Sears that he would be ready for inventory, but after he received merchandise from the closed store, he told Sears that it would not be possible for him to do all of the things he needed to do to be ready for inventory.   *See* Copeland Depo., at 128.   Sears told him to do his best.   *See id.* at 129.   Larry Hudson, an African-American store manager, testified that Copeland's "store wasn't being, in my opinion, prepared on a timely basis, on the timely frame, but Carl was always – he said that it would be ready.   So he was a very experienced manager.   So I just assumed that it would be ready, going on his word." *See* Hudson Depo., at 18-19.

6

Sears arrived at Plaintiff's store on January 25, 2002, and determined that it was not prepared for the inventory. *See* Sears Depo., at 53-54. Sears called in help from other stores in the district and the inventory proceeded. Plaintiff specifically agreed in his deposition that there were some aspects of the store, cosmetics in particular, that were not prepared for inventory. *See* Copeland Depo., at 123-24. *See also* Dugger Depo., at 49 (the store was about 85% ready for inventory and there were problems with the cosmetics). Ms. Dugger also testified that other managers were called to the store on the day of the inventory. *Id.* at 97. Ms. Glass testified that she thought the decision had been made the day before the inventory to bring additional managers in because Sears and Mr. Hudson did not believe the store was ready for inventory. *See* Glass Depo., at 55-57. Mr. Hudson testified that "the store was not in good shape" on the day of the inventory. *See* Hudson Depo., at 26. "There were several areas that was, you know – it was several areas that was not prepared for an AIM inventory." *Id.* "It was all the sections, I mean. Basically, most of the sections that wasn't ready was areas that he was talking about, the peg areas and school supplies and toys and cosmetics." *Id.* at 30. Sears "called in other store managers during that morning while inventory was going on. We would be straightening up sections before the inventory crew got there to that section so that they could count it properly." *Id.* at 27. Mr. Hudson "was running around doing that and other stuff, too." *Id.* It "was a tough inventory, I'll just put it – it was tough. It was hard." *Id.*

Sears issued a final written warning called Coaching and Counseling to both Plaintiff and Ms. Dugger on January 25, 2002, because he felt they did not meet his expectations of what it takes for a store to be prepared for inventory.

During the rush of the inventory, Sears became concerned about whether Plaintiff properly handled the twenty-four boxes of merchandise from the closed store, or whether he had immediately "zeroed out" the merchandise without going through the proper markdown steps.  On the day of the inventory, Plaintiff provided markdown reports to Sears.  *See* Hudson Depo., at 35.  While Mr. Hudson was present, Sears asked Plaintiff what had been done with $10,000 worth of product that had been marked down.  *Id.*  Mr. Hudson testified that Plaintiff told Sears that he (Plaintiff) threw it away.  *Id.* [1]

After the inventory, Sears asked Charlene Glass to examine the markdown reports.  *See* Hudson Depo., at 35-36.   On the report, Ms. Glass highlighted in yellow items that she transferred from the closed store to Plaintiff's store.  *Id.* at 36.   Sears and Mr. Hudson

---

[1]Plaintiff remarks on several occasions that Sears was not really concerned with the markdowns because that issue was not addressed in the final written warning he received on the day of the inventory.  Plaintiff appears to conflate two separate issues.  Plaintiff is correct that on the actual day of the inventory, the disciplinary notice that Plaintiff and Ms. Dugger received was for failure to have the store ready for inventory.  This notice did not mention the marked-down or transferred merchandise.   However, there is nothing suspicious about this because it only occurred to Sears on the day of the inventory that he could not locate certain merchandise he believed should be in the store.  He further investigated the matter after the inventory.

AO 72A
(Rev.8/82)

reviewed this report. *Id.* They concluded that regular product had been marked down to zero and destroyed. *Id.* Mr. Hudson further testified:

Q:    Were you surprised that so much of this product had been marked down and destroyed on the eve of the inventory?

A:    Yeah. I was really – I was surprised that – of the figure of 10 – of that figure because, I mean, that was – that was a lot for a week. I actually thought that Carl had got it mixed up. That's the reason I asked him several times.

Q:    Maybe it would have been for a year.

A:    Right, exactly. That's the reason I asked him. I said I was talking about for the week, Carl, not a yearly figure.

Q:    Did you even talk to Felicia [Dugger] about whether she was involved in marking down or destroying any of this product?

A:    I didn't ask her any questions, but she did tell me that she was following instructions.

Q:    From Carl?

A:    Right.

Q:    When she marked down the product or destroyed it?

A:    Right.

Q:    Did you conclude from reviewing the report that some of the regular product that had been shipped from the Decatur store had also been marked down and destroyed?

A:    I mean, it was obvious that some of the stuff from – I looked at the markdown report and compared it to the inventory transfer report, and some of the same product, yes, was.

9

Q:    When Mr. Sears asked Carl in your presence about why this had happened, what had happened, did Mr. Copeland offer any explanation for why he had marked down and destroyed all of this product improperly?

A:    All I heard was he asked Carl what happened.  Carl said he threw it away, and Kent just – he said you did what.  He said that several times.  They was going to the back room after that.

Q:    So I take it that Carl never explained to you why he had done this?

A:    He had no reason to explain it to me.

Q:    Okay.  Did you notice that day when you were in the store whether there were any markdowns out on the floor?

A:    Seemed like it was some markdowns in a tote, in some totes, in a couple totes in the stock room.  That's all I remember on markdowns.  I don't remember a section of markdowns, he had marked down.

Q:    In the back room, but not on the floor?

A:    Right.

*Id.* at 36-38.

Similarly, Ms. Glass, testified that Sears had concerns about the markdowns at Plaintiff's store and asked her to review the markdown reports for Plaintiff's store to determine what was not supposed to have been marked down.  *See* Glass Depo., at 60.  Ms. Glass reviewed the markdown sheets and informed Sears that "some of this product was not marked down correctly."  *Id.* at 62.  To make this determination, Ms. Glass compared the transfer sheets which showed which merchandise had been sent from the Decatur store to Plaintiff's store with the markdown sheets from Plaintiff's store.  *Id.* at 63-64.  Ms. Glass

10

then reported to Sears that she found that merchandise transferred from the Decatur store had been marked down to zero.  *Id.* at 64.  She cannot recall having any further discussions with Sears after that.  *Id.* at 65.  Ms. Glass testified that she was surprised to "learn that all of this product had been marked down 100 percent."  *Id.*

Sears called his supervisor, Russ Dossey, and informed him he believed there had been a significant loss of merchandise at Plaintiff's store.  Sears and Dossey had a telephone conference with individuals from human resources and loss prevention around January 30, 2002.  The four determined that Plaintiff should be discharged for failure to prevent loss of store assets.  Sears and Thomas Stahelek, a loss prevention manager for Defendant, met with Plaintiff on February 5, 2002, to discuss the markdowns issue.  In his own statements to Sears and Stahelek, Plaintiff never contested that the improper markdowns had taken place; rather, he stated that he had nothing to do with them.  *See* Copeland Depo., at 63.  Plaintiff told Sears and Stahelek that the "markdowns was taken on Felicia's watch."  *Id.*  He said that Ms. Dugger had taken the markdowns and she had destroyed the product.  *Id.* at 63-64; 90.  Sears and Stahelek informed Plaintiff he was terminated and requested his keys.

Sears and Stahelek interviewed Ms. Dugger immediately after terminating Plaintiff. Ms. Dugger told them that $10,000 worth of regular stock and discontinued items had been marked down in violation of Defendant's policy.  *See* Stahelek Depo., at 185.  She further stated that Plaintiff directed her to take these actions.  *Id.*

11

To take Plaintiff's place as store manager, Sears named Willie Chestnut, who is African-American.   Plaintiff filed a charge of discrimination with the EEOC which was dismissed as untimely.  Plaintiff then filed the instant suit.

### C.   Objections

With respect to his failure to promote claim under "pattern and practice" and disparate impact theories, Plaintiff contends that the Magistrate Judge has misconstrued the nature of his claims by failing to recognize that his overarching claim is that Defendant employs a "secret succession planning" scheme utilizing subjective criteria and lacking any job postings which adversely impacts all African-Americans in general and Plaintiff specifically by denying him any opportunity to advance within the company.   This failure to comprehend the nature of his claims, Plaintiff avers, also caused the Magistrate Judge to improperly bar some of Plaintiff's claims under a statute of limitations analysis.   He also argues that the Magistrate Judge applied an incorrect legal analysis to Plaintiff's statistical evidence because Plaintiff's expert should not be expected to control for variables in promotion which were not utilized by Defendant.   He avers that he offered statistical evidence to show that minorities were assigned to stores with high crime rates and high shrinkage rates, and the Magistrate Judge improperly excluded the anecdotal   testimony of other black managers that their stores were located in high crime minority neighborhoods.

Plaintiff also contends that the Magistrate Judge made credibility determinations when she concluded there was no evidence that Sears "set up" Plaintiff to fail the inventory process

12

and that Plaintiff had not presented evidence to dispute Sears' good faith belief that Plaintiff was not prepared for the inventory and improperly marked down merchandise. Plaintiff objects that while the Magistrate Judge noted that Plaintiff consistently fell in the bottom of the overall ranking of the group of managers in his region, she did not also note that in some categories, Plaintiff lead his region. Plaintiff avers that he presented evidence to show that store managers "historically" were excused from managers' meetings if they happened during the week of their inventory. Plaintiff argues that the Magistrate Judge did not focus on the fact that Ms. Glass's recollection of events concerning the markdown of product differed in some respects with Sears' or that Sears did not mention the markdown problems when he gave Plaintiff a final written warning on the day of the inventory for lack of preparation.

Finally, Plaintiff argues that the Magistrate Judge incorrectly concluded that Plaintiff could not demonstrate he had an "objectively reasonable belief" that Sears engaged in discriminatory behavior when he spoke to Ms. Dugger about transferring her. Because that conversation took place in temporal proximity to his termination, Plaintiff asserts he can establish the causation element of his retaliation claim.

## II.    Discussion

### A.    Preliminary Matters

The court takes note of the volumes of evidence, briefing, and argument raised in this single plaintiff employment discrimination case. Due to the length of the objections raised by Plaintiff, the court has undertaken to review each filing made by the parties in this case, as

13

well as the supporting evidence in the record upon which the briefing is allegedly based. Rather than address each of Plaintiff's objections point by point, the court finds it will be more efficient to review Plaintiff's claims once again with a focus on issues that are outcome determinative and through those discussions address only the relevant objections made by Plaintiff.

In particular, the court has thoroughly reviewed the parties' statement of material facts which total a remarkable 383 pages. The manner in which the parties have contested facts makes them of extremely limited usefulness to the court. The court gives one example of the problem. Defendant proffers that "Hudson felt that Copeland's inventory was a 'hard' and 'tough inventory' trying to keep ahead of the crew." *See* Statement, ¶ 149 (citing Hudson Dep., p. 27, lines 22-25). The court reviewed this page of Mr. Hudson's deposition, and Defendant's statement reflects precisely what he testified. Inexplicably, Plaintiff disputes this statement. "Dispute. Inventory was successfully taken on that date. (Hudson dep. p. 28 lines 1-2)." *See* Response, ¶ 149. As an initial matter, Plaintiff's statement – even considering it as written – does not dispute Defendant's statement. Even more significantly, however, Mr. Hudson never uttered the word "successfully." *See* Hudson Depo., at 28. Rather, counsel asked, "Did the crew finish the inventory that day?" and Mr. Hudson responded, "They did finish." *Id*. Disingenuous responses like this diminish the credibility of counsel's arguments and force the court to scour the record itself, a waste of resources under any circumstances,

14

even more egregious where the parties have already expended 383 pages on the matter of facts alone.

This is not an isolated incident.  Defendant asserts, "Hudson confirmed that all of the criticism of the store's condition in the written counseling given to Carl Copeland as a result of the inventory was true.  Hudson Dep., p. 29, lines 13-25."  *See* Defendant's Statement, ¶ 157.  The court reviewed the deposition.  Counsel asked, "I understand you didn't prepare the document.  Do you agree with the condition of the store on the day of the inventory as stated in the document?"  Mr. Hudson answers, "That's true, ***everything in there.***"  *See* Hudson Depo., at 29 (emphasis added).  Once again, however, Plaintiff inexplicably denies Defendant's statement.  "Dispute.  Hudson's testimony is that he was not present when the final warnings were given and he was surprised to see his signature on the forms. (Hudson dep., p. 30 lines 7-23)."  *See* Response, ¶ 157.  There is nothing in Plaintiff's statement that refutes Defendant's statement.  Whether Mr. Hudson was present at the time Plaintiff and Ms. Dugger were presented with the final warnings and whether he remembers signing the warnings is irrelevant to the content of the warnings.  Mr. Hudson unequivocally testified that he agreed with every statement in the warnings concerning the lack of preparation of the store for the inventory crew.

The court also wishes to emphasize its grave concerns about the increasing practice of parties to submit declarations or affidavits in response to a motion for summary judgment

15

of witnesses who have already given depositions in a matter.   The propensity for mischief in this procedure is rampant.   The purpose of discovery is for each party to be able to get all of its facts on the table.   Summary judgment is then briefed based on that set of facts.   The submission of affidavits *after* a defendant has moved for summary judgment makes it extremely difficult to maintain a clean record of facts and leaves the defendant without any opportunity to rebut those "newly-discovered" facts.   This practice is particularly troublesome where the testimony in the "new" affidavit addresses the *very same* subjects covered in the deposition with the immediate benefit of cross-examination.   The court has reviewed the objections filed by Defendant to the "new" affidavits of Mr. Garcia, Mr. Johnson, and Plaintiff, himself.   The court finds the objections to be well-taken and will specifically address them below as necessary and relevant to the dispositive findings of the court.

**B.     Failure to Promote Claims - Pattern and Practice/Disparate Impact Theories**

1.     <u>Identification of Promotions</u>

During the course of discovery, Defendant and the Magistrate Judge attempted to have Plaintiff identify specific promotions he believed he should have received.   Plaintiff resisted such efforts arguing that he challenged Defendant's whole system of promotions.   Plaintiff also asserted that because Defendant did not post job openings, he did not have to identify specific positions for which he applied. .

16

He is correct in this contention, but contrary to Plaintiff's assertions, it is not enough to show that advancement decisions were made on the basis of some subjective criteria and a system that lacked job postings. It is true that the Eleventh Circuit has held that "subjective practices such as interviews and supervisory recommendations are capable of operating as barriers to minority advancement," *see Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir. 1985), but the court has also held that subjective criteria are not per se improper and cannot be used to show pretext "[a]bsent evidence that subjective hiring criteria were used as a mask for discrimination." *See Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001).

*Joseph v. Publix Super Markets, Inc.*, 151 Fed. Appx. 760 (11th Cir. 2005) (per curiam), cited by Plaintiff repeatedly in his objections, also does not support this contention. There, the plaintiff raised only a disparate treatment claim asserting that Publix refused to transfer him to a higher grossing store on the basis of his race. As an initial matter, *Publix* was in the procedural posture of reviewing a jury verdict. Furthermore, because the case was tried to a jury, the Eleventh Circuit did not consider whether the plaintiff had provided sufficient evidence to present a prima facie case of discrimination. *See* 151 Fed. Appx. at 764-75 ("Thus, in a disparate treatment case fully tried on the merits, our review of the validity of a judgment as a matter of law is limited to the question whether the plaintiff presented sufficient evidence to prove each element of his or her claim.").

17

Nothing in *Publix* stands for the proposition that the lack of a job posting system, itself, can be sufficient evidence of intentional discrimination.   As noted,   Plaintiff is correct that *Publix* may relieve him of the opportunity to set forth any specific promotions for which he applied.   *See id*. at 766 ("Because Publix did not publish a notice of available positions for produce manager, however, [plaintiff] could not identify each specific transfer he was denied as a result of racial discrimination.").   Thus, the court concluded, "[b]ecause Publix failed to post notice of vacancies for produce managers in higher volume stores, [the plaintiff] was not required to demonstrate that he asked for a transfer."   *Id*. at 768.   The court found that based on the evidence submitted by the plaintiff that he had trained white employees with less experience than he had, and those employees were offered transfers to higher volume stores, "a reasonable jury could have concluded that [the plaintiff] was not transferred to [higher volume stores] because of Publix's highly informal procedures for transfers to higher volume stores enabled it to engage in highly subjective and discriminatory employment decisions." *Id*. at 767.   As the Magistrate Judge noted in her discussion of Plaintiff's disparate treatment failure to promote claim, however, Plaintiff, has not produced any evidence from which a jury could conclude that Defendant had promoted lesser qualified individuals outside his protected class over him.   *See* Report and Recommendation, at 50-53.   Thus, even if the court relieves Plaintiff of the requirement to identify specific promotions, unlike the plaintiff in *Publix* who presented evidence that lesser qualified individuals were transferred to higher grossing stores

over him, Plaintiff has proffered no evidence that lesser qualified individuals were promoted over him.

2.      Disparate Impact/Pattern and Practice - *Cooper v. Southern Co.*

The court finds that although Plaintiff contends that neither the Magistrate Judge nor Defendant ever truly understood the nature of his Complaint, both referenced *Cooper v. Southern Co.*, 390 F.3d 695 (11th Cir. 2004), a case which raised claims on the same theories as Plaintiff.   It is true that *Cooper* was at the class certification stage, but that does not diminish the import of the case to Plaintiff's claims.   Due to the similarity, the court finds that a thorough review of *Cooper* will be a helpful guide to all parties.[2]

In *Cooper*, a group of African-American employees filed a class action lawsuit against various Southern Company entity employers claiming discrimination in promotions and compensation and a racially hostile work environment.   Of particular relevance here, the plaintiffs claimed that the defendants shared common promotions and compensation policies which fostered race discrimination and had a disparate impact on the plaintiffs.   "To establish a 'pattern or practice' or disparate treatment, the plaintiff must show that intentional discrimination was the employer's 'standard operating procedure.'"   *Id.* at 716.   "The plaintiff

_____

[2]The court recognizes that in *Ash v. Tyson Foods, Inc.*, ___ U.S. ___, 126 S. Ct. 1195 (2006), the Supreme Court disapproved of the "jump off the page and slap you in the face" language used in the Eleventh Circuit to compare relative qualifications among employees.

can prove that discrimination was the standard operating procedure 'through a combination of statistics and anecdotes." *Id.* "To meet his burden of proof, a plaintiff must prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts.   It ha[s] to establish by a preponderance of the evidence that discrimination is the regular rather than the unusual practice." *Id.* at 724.

> To prove disparate impact, a plaintiff *must* establish the existence of a statistically significant disparity among members of different groups affected by a type of employment decision; a specific, facially neutral employment practice involved in the decision; and a causal nexus between the facially neutral employment practice and the statistically significant disparity.

*Id*. at 716.   To satisfy "the third, critical requirement, a plaintiff must offer statistical evidence of a kind and degree sufficient to show that *the practice in question* has *caused* the exclusion of applicants for jobs or promotions because of their membership in a protected group."   *Id.* at 724 (emphasis in original; quotations and citations omitted).   Pattern and practice claims and disparate treatment claims require proof of discriminatory intent.   Disparate impact does not.  *Id.* at 723.   "[P]attern and practice and disparate impact claims depend on the same body of statistical evidence.  Accordingly, these claims stand or fall in concert." *Id.* at 726.

The district and appellate court criticized plaintiffs' statistical evidence on many fronts in *Cooper*.   The expert's "reports did not incorporate variables that would allow for the comparison of individuals who were similarly situated with respect to managerial decision makers, job types, locations, departments, and the specific criteria relevant for the jobs in

question." *Id.* at 717.  The expert's report also "did not take into account the type or level of acquired skills of job applicants." *Id.*

> And the reports did not factor in any employee's actual job performance, a consideration that is undeniably important in decisions relating to compensation and promotion.  Indeed, without taking into account job performance at all, the fact that two employees began their employment with the defendants at the same time and have not been promoted at the same rate does not establish that discrimination is at work.

*Id.* at 717-18.  The court criticized the expert's report because it "did not take into account how many and which employees *actually applied [for competitive promotions]*, [] a significant factor in making any meaningful generalizations about allegedly discriminatory promotion practices."  *Id.* at 718 (emphasis in original).  Finally, the court noted that the reports "did not establish the existence of any specific promotion or compensation policy or practice, let alone trace the alleged racial disparities to such a policy or practice."  *Id.*  The court also agreed that the plaintiffs' proffered anecdotal evidence was not sufficient to establish a "pattern and practice of discrimination."  *Id.* at 719.  Specifically, the court noted:

> [P]laintiffs say they identified a statistical disparity between white and black employees, along with a facially neutral employment practice – the use of subjective hiring criteria by the defendants – that has caused this disparity.  First, however, a substantial question exists as to whether the plaintiffs' statistical evidence is sufficiently tailored to establish statistical disparities within the specific segments of the defendants' workforce in which the individual plaintiffs worked.  .  .  .  But even assuming that the plaintiffs had met this requirement, they have failed to demonstrate a causal nexus between any statistical disparities in the defendants' workforce and the practice of using partially subjective hiring criteria by some managers in some of the defendants' facilities.

21

*Id*. at 726.   The court then went on to consider the district court's ruling on the individual plaintiffs' motions for summary judgment.   The court uses the Eleventh Circuit's opinion in *Cooper* as a guide to analyze Plaintiff's claims here and begins with consideration of Plaintiff's expert statistical evidence.

3.    Expert Statistical Evidence

As an initial matter, the court strikes Dr. Crunk's March 20, 2006 affidavit from the record as untimely.   Despite the fact that Plaintiff characterizes it as "rebuttal," the affidavit constitutes an opinion and new expert analysis far outside the discovery period and was not previously disclosed.   *See* Federal Rule of Civil Procedure 26.   The court will not consider any information contained in the March 20, 2006 affidavit.

Second, and extremely significant for the disparate impact portion of Plaintiff's case, Dr. Crunk found that the difference in the rates of promotion between blacks and whites is "not statistically significant."   *See* Crunk Report, at 11.   This finding, or lack thereof, really ends the inquiry.   Whether Plaintiff believes this to be a "technical" distinction or wishes to discuss the "odds" of promotion, in a disparate impact case using statistical evidence, plaintiff must come forward with a statistically significant difference or no inference of discrimination can be shown.   *See*, *e.g.*, *Peightal v. Metropolitan Dade County*, 940 F.2d 1394, 1406 (11th Cir. 1991) ("The 'general rule' is that the disparity must be 'greater than two or three standard deviations' before it can be inferred the employer has engaged in illegal discrimination under Title VII.").   Plaintiff has not done this and the failure permeates Plaintiff's entire case.

22

Plaintiff's case is premised on an allegedly discriminatory system where blacks are placed in undesirable stores which cannot perform well because of neighborhood crime, therefore preventing black managers from having the high volume and low shrinkage statistics necessary to be considered for advancement.  If there is no evidence that blacks have been disadvantaged in advancement, Plaintiff's entire theory falls apart.  Dr. Crunk also did no analysis of whether blacks were denied transfers to higher volume stores at a statistically significant rate. Accordingly, the court GRANTS the Motion for Summary Judgement on the failure to promote claim on this theory.

The court also notices Defendant's *Daubert* challenge to Dr. Crunk's expert report. Generally, expert testimony may be admitted into evidence if (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated by *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *See generally Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

Magistrate Judge Cole did not conduct a full-blown *Daubert* analysis with respect to Dr. Crunk's expert testimony but rather followed the approach taken in *Cooper*.  There, the district court did not exclude the statistical evidence presented by the expert because she was unqualified or because it was based on a wholly unreliable methodology; rather, "the court

accepted the reports' conclusions but determined that they still failed to establish that the named plaintiffs had claims in *common* with other class members under either a pattern and practice or disparate impact theory." 390 F.3d at 717 (emphasis in original). The court continued:

> the district court concluded that these methodological deficiencies rendered it impossible to determine what the salary and promotions gaps were, whether they were statistically significant, or whether factors other than race were involved. Thus, the district court observed that there had been an inadequate showing by Plaintiffs to raise a presumption of discrimination arising from application of the collective whole of Defendants' compensation and promotion policies. *See also Maddox v. Claytor*, 764 F.2d 1539, 1552 (11th Cir. 1985) ("Multiple regression analysis measures the probability that the calculated disparity could occur randomly – but the analysis in no way validated the calculation of the disparity itself. If the tested disparity is based on erroneous assumptions or suffers from flaws in the underlying data, then standard deviation analysis is foredoomed to yield an equally faulty result.") (internal punctuation, quotations, and citations omitted).

*Id.* at 718.

Whether one couches it in terms of *Daubert* – that the methodology used by Dr. Crunk was insufficiently reliable – or in terms of *Cooper* – that the statistical analysis provided by Dr. Crunk was insufficient to create a material dispute of fact as to the impact of Defendant's "secret succession scheme" – the result obtained is the same: For the reasons discussed below, Plaintiff has failed to raise an inference of discrimination flowing from Defendant's succession system. A full *Daubert* treatment would have undoubtedly resulted in the exclusion of the testimony.

Assuming that the testimony is not excluded under *Daubert*, Plaintiff alleges that *Cooper* is inapposite because it faulted the expert's statistical analysis for failure to account for variables that the employer actually used in evaluating employees. In contrast, Plaintiff contends, here, Defendant did not actually use any of the those variables, but rather relied on the "secret succession planning" to determine where to place individuals for advancement. However, this is not an accurate depiction of the evidence. Contrary to Plaintiff's assertion, Defendant proffered evidence here concerning the types of qualities, experiences, and backgrounds that are necessary in order to advance. *See* Valois Depo., at 48 (store managers are evaluated on the basis of "Triple S" which is a customer service score card and an execution evaluation; volume of store sales as relates to budget); Dossey Depo., at 288-92 (store managers evaluated on the basis of store performance, training of assistant store managers, cleanliness and integrity of store merchandising, financial performance, compliance, disciplinary history, "shrink"); and Hay Rule 30(b)(6) Depo., at 65-91 (store managers are evaluated on the basis of their sales figures, sales goals, scan rates of Extra Care cards, execution score card which includes whether price changes are timely, shrink, budget, Store Manager Readiness evaluation sheet, profits and losses). Plaintiff offers no evidence to dispute this testimony.

That these factors are considered through the lens of an evaluation process that has supervisors "force ranking" store managers does not mean Defendant does not actually utilize these criteria. Thus, Dr. Crunk's failure to adjust for any of these variables renders his

statistical analysis as unhelpful as that provided in *Cooper* where plaintiffs' expert statistical analysis was rejected because the expert had failed "to incorporate variables that would allow for the comparison of individuals who were similarly-situated with respect to managerial decision-makers, job types, locations, departments, and the specific criteria relevant for the jobs in question." *See* 390 F.3d at 717.   Specifically, Dr. Crunk did not consider the performance of either the individual or the individual's store.   He did not take into account the individual's length of service, or relative qualifications such as education.   He also did not consider whether an individual had a disciplinary record which would impact eligibility for promotion.   The court finds these failings have the same impact here as they did in *Cooper*.[3]

Defendant has raised other flaws in Dr. Crunk's analysis, but the court finds this discussion sufficient to conclude that Plaintiff has failed to raise an inference of discrimination flowing from the "secret" succession planning system.[4]

---

[3]The court further notes that contrary to Plaintiff's assertions in his objections, Plaintiff's expert could have had access to the underlying data to perform such statistical interpretations.   Educational background was contained in the personnel files of store managers produced to Plaintiff for inspection.   Defendant also produced the start dates for employees who were store managers and when they became store managers.   Some of this data was not requested by Plaintiff until after the deadline for discovery had closed and the Magistrate Judge denied Plaintiff's request for this information.

[4]In both his responses to Defendant's motions and in the Objections to the Report and Recommendation, Plaintiff appears to assert that the court previously ordered that the relevant time frame for Plaintiff's claims was December 1999 through February 2004.   *See*, *e.g.*, Response to Defendant's Expert Objections, at 3.   While it is true that the court ordered that

26

Furthermore, as the Magistrate Judge correctly noted in her Report and Recommendation, even if the court were to accept Dr. Crunk's analysis that black managers are placed in "ethnic" neighborhoods, Plaintiff has failed to establish a causal link between that placement and hindrance on job performance or advancement.   In contrast, Defendant offered testimony that the neighborhood in which a CVS store is located has no direct correlation to the bottom-line profit and losses for that store.   *See* Statement, ¶ 489 (citing deposition testimony of Sears, Valois, and Hay as CVS' 30(b)(6) representative).   Plaintiff attempts to dispute this statement by citing to Dr. Crunk's report at pages 9-10.   However, Dr. Crunk's report does not address at all the type of stores located in "ethnic" neighborhoods. It is true that Larry Hudson testified that he believed CVS kept black managers in stores where the gross would be very low and the crime high so that those managers would not be eligible for a bonus.   *See* Hudson Depo., at 63-64.   This testimony relates only to compensation issues and does not relate to whether placement in "high crime" store would hinder advancement. Further, such anecdotal evidence is not sufficient to show a "pattern or practice" or disparate impact.   Statistical evidence in combination with anecdotal evidence could be sufficient, but Plaintiff has not proffered sufficient statistical evidence and Mr. Hudson's anecdotal evidence is general.   The newly-filed affidavits of Messrs. Johnson and Garcia do not change the outcome.   *See Cooper*, 390 F.3d at 719 (affirming district court's conclusion that series of

discovery related to this time frame, the court made no ruling that this would be the relevant time frame when analyzing Plaintiff's claims.

affidavits of anecdotal evidence of racial jokes and slurs, display of nooses, or belief among employees that "glass ceiling" existed for black employees "inadequate to establish . . . a pattern and practice of discrimination").

Defendant further provided testimony to show that stores in less affluent areas can be busier than stores in affluent areas. Because 70% of CVS' profits are pharmacy related, if an area has more customers who pay with cash or received Medicaid reimbursement, a CVS store can be successful in these neighborhoods. *See* Statements, ¶¶ 489-93. The court disagrees with Plaintiff's assessment that this testimony is immaterial. If Plaintiff cannot show that placement in "ethnic" stores is "undesirable," then Plaintiff cannot show that the purported "secret succession planning" program at CVS disadvantages black store managers.

Finally, even if the court were to accept the statistical findings made by Dr. Crunk, the court also finds that Plaintiff has failed to satisfy the third requirement of a disparate impact case. As with the plaintiffs in *Cooper*, Plaintiff has "failed to demonstrate a causal nexus between any statistical disparities in the defendants' workforce and the practice of using partially subjective hiring criteria." 390 F.3d at 726. In fact, Plaintiff has not even made an effort to link the partial use of subjective criteria in performance evaluation of store managers to any alleged statistical disparities.

4.    Statute of Limitations

Plaintiff asserts in his objections that the Magistrate Judge misconstrued his "secretive succession planning" theory. Plaintiff avers that "his claims were not meant to attack specific,

28

discrete acts, but were claims that CVS maintains a discriminatory employment scheme which adversely impacts all African-American store managers in general and the Plaintiff in particular." *See* Objections, at 6.  Plaintiff goes on to argue that the Magistrate Judge misapplied the Supreme Court's ruling in *Morgan* because she did not understand the "systemic" nature of Plaintiff's complaint.  To the contrary, the court finds that the Magistrate Judge addressed this precise issue in her Report and Recommendation.  *See* Report and Recommendation, at 35-41.  The Magistrate Judge discusses three circuit court opinions which specifically address Plaintiff's theory.  *See Davidson v. America Online, Inc.*, 337 F.3d 1179 (10th Cir. 2003); *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003); and *Williams v. Giant Food, Inc.*, 370 F.3d 423 (4th Cir. 2004).

The court recognizes that *Davidson*, *Cherosky*, and *Williams* were disparate treatment cases and that Plaintiff here makes both disparate treatment and disparate impact claims.  The court further recognizes that *Morgan* specifically refrained from discussing the impact its holding might have on so-called "pattern and practice" claims.  *See* 536 U.S. at 115 n.9 ("We have no occasion here to consider the timely filing question with respect to "pattern-or-practice" claims brought by private litigants as none are at issue here.").  In addition to the fact that the Magistrate Judge's analysis would apply directly to Plaintiff's disparate treatment claims, the court need not resolve the statute of limitations issue with respect to Plaintiff's "systemic" claims because, as the court found above, they fail substantively.

29

The court might also note that it is not clear that the individual Plaintiff here could even bring a "pattern and practice" claim as that term is technically understood. In *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000), the court noted that a pattern and practice claim could be brought by the EEOC if there is "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice" of discrimination. *Id.* at 1286. Alternatively, "a class of private plaintiffs" could bring a pattern or practice claim under 42 U.S.C. § 2000e. Plaintiff, here, does not fit into either category. Because the court found above, however, that Plaintiff's statistical evidence is not sufficient, the court need not decide whether Plaintiff can bring a "pattern and practice" claim in addition to his disparate impact claim.

For the foregoing reasons, the court finds that the Magistrate Judge correctly determined that Plaintiff's statistical evidence failed to establish that Defendant's succession planning tool had a disparate impact on black employees. The court now turns to Plaintiff's disparate treatment claims.

**C.    Disparate Treatment**

  1.    <u>Promotion</u>

The degree to which Plaintiff raises a disparate treatment discrimination claim for failure to promote is unclear from Plaintiff's briefings. In his objections, Plaintiff clearly asserts that his claims "were not meant to attack specific, discrete acts, but were claims that CVS maintains a discriminatory employment scheme which adversely impacts all African-

30

American store managers in general and the Plaintiff in particular." *See* Objections, at 6. Plaintiff goes on further to argue that the Magistrate Judge created an "erroneous claim" that "Plaintiff was claiming that he had been denied a specific position or promotion." *Id*. In that sense, Plaintiff appears to disclaim any failure to promote disparate treatment claim.

Out of an abundance of caution, the Magistrate Judge reviewed Plaintiff's failure to promote claim under a *McDonnell-Douglas* disparate treatment framework. *See* Report and Recommendation, at 49-53. She identified promotions that were made during the relevant time period and concluded that Plaintiff had not proffered evidence to show that Defendant's legitimate non-discriminatory reasons for those promotions – the individuals promoted had been ranked higher than Plaintiff in evaluations – were pretextual. *Id.*

On several occasions in his objections, Plaintiff asserts that his rankings in the succession planning process were subjective and that objective points of evaluation showed Plaintiff was "leading his Region in store performance according to objectively measured standards." *See* Objections, at 20; at 33 (contending the Magistrate Judge failed to balance the evidence of Plaintiff's ranking against the "admitted evidence which disputes the accuracy of these ratings and raised an inference of discrimination"). According to Plaintiff, these objective standards are (1) store 4530 was ahead of average year to date percentages for Execution Detail, (2) store 4530 had good scores on Current Semester Triple "S," Loss Prevention Baseline Review, DSD Compliance Report, and Current Shelf Label Price Accuracy Report, (3) in 2000, Plaintiff received an award for the highest contribution "A"

31

percentage in Region 25, (4) in February 2002, store 4530 received an award for Best Execution and Best Overall Pharmacy in Region 25, and (5) at the time of his termination, store 4530 ranked 879 out of 4,168 CVS stores in Triple "S" scores.

Plaintiff has not shown evidence from which a jury could conclude, however, that there is a "serious and unexplained disconnect" between these facts and Plaintiff's lack of promotion. *See* Objections, at 32-33. As described above, Defendant presented undisputed testimony concerning the numerous factors of background, qualifications, and experience that go into ranking store managers for promotion. Plaintiff may be of the opinion that the five factors he cites are the only factors an employer should consider for promotion, but it is not the court's role to make a business judgment as to what evaluation Defendant should use for promotions purposes.

Even accepting these five factors offered by Plaintiff, furthermore, does not demonstrate that Defendant's legitimate, non-discriminatory reasons for not promoting Plaintiff were pretextual. Plaintiff's numbers on these five factors alone do not demonstrate how Plaintiff was performing in comparison to other store managers eligible for promotion. Thus, the court finds that Plaintiff has not proffered sufficient evidence from which a jury could conclude that no reasonable person would have chosen the promoted candidates over Plaintiff. *See Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195 (citing with approval language in *Cooper* "disparities in qualifications must be of such weight and significance that no

32

reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question").

        2.    <u>Termination</u>

With respect to his termination, Plaintiff raises both a disparate treatment race discrimination and retaliation claim.  Magistrate Judge Cole assumed that Plaintiff could set forth a prima facie case of race discrimination and retaliation with respect to his termination. This court, however, has deep concerns about Plaintiff's ability to do so.  After he was terminated, Plaintiff was replaced with a member of his own protected class, Willie Chestnut. Thus, Plaintiff must show that someone outside of his protected class engaged in similar misconduct – failure to prepare for an inventory and receipt of a final written warning followed by improper markdown of merchandise – but was not terminated.  Plaintiff has not even made an effort to identify such an event.  Without such a comparator, Plaintiff's prima facie case fails and the court need not go further and GRANTS the Motion for Summary Judgment on this claim.

However, for the purpose of addressing various issues raised in Plaintiff's objections, the court proceeds to the next step of the analysis and considers whether Plaintiff has adduced any evidence to show that Defendant's legitimate non-discriminatory reasons for termination are pretextual.

The key issue with respect to Plaintiff's termination is whether Sears had a good faith belief that Plaintiff had violated Defendant's policy concerning markdowns when he threw

away $10,000 worth of goods.[5]   Thus, the court specifically focuses on the testimony of witnesses as to what they reported to Sears, the decision-maker, at the time he decided to terminate Plaintiff.   Sears asked Plaintiff what happened to the merchandise, and Plaintiff responded that it had been thrown away.   Mr. Hudson was present on the day of inventory and actually spoke with Plaintiff about these problems.   He was also present for the initial conversations between Plaintiff and Sears, including Plaintiff informing Sears that the merchandise had been thrown away.   The fact that Mr. Hudson's recollection of the problems matches that offered by Sears is strong evidence that Sears' view of the situation was made in good faith.

Similarly, Ms. Glass testified that Sears asked her to review the markdown report for Plaintiff's store.   She testified that she told Sears that some of the product had not been properly marked down.   Because the focus is on what Ms. Glass told Sears at the time of Plaintiff's termination, Plaintiff's protestations that on the day of her deposition, Ms. Glass could not recall exactly what the highlighting on certain documents meant is not relevant to the analysis.   *See* Response, ¶ 182.   Ms. Glass was unequivocal in her testimony that she informed Sears that some merchandise had not been properly marked down.

---

[5]   Plaintiff attempts to conflate the warning about the lack of readiness for inventory into the cause of his discharge by suggesting that Sears was setting him up. For this to work it must appear that Sears would expect that Plaintiff would order $10,000 worth of merchandise to be thrown away so as to provide Sears with a really good reason to fire Plaintiff.  No reasonable jury would ever find that.

AO 72A
(Rev.8/82)

Plaintiff avers that Ms. Dugger now disclaims a portion of the statement that she made to Sears and Stahelek the day Plaintiff was terminated.  As an initial matter, the fact that Ms. Dugger disclaims a portion of those statements now does not change the fact that on the day of Plaintiff's termination, Sears had been told by Ms. Dugger that Plaintiff directed her to improperly mark down merchandise in violation of company policy.  Furthermore, the court notes that in her deposition, Ms. Dugger asserts only that she was "coached" as to the value of the merchandise and not as to any of her other statements.  *See* Dugger Depo., at 171, 173 (testifying that the statement she gave to Sears and Stahelek was accurate in all respects other than the dollar amount)).

Moreover, Plaintiff, himself, has admitted that Ms. Dugger told Sears and Stahelek that she threw destroyed merchandise in the dumpster.  *See* Sears Depo., at 213; Dugger Depo., at 170; Response, ¶ 226.  Thus, Sears certainly had a good faith belief at the time of termination that this is what in fact had occurred.  Finally, when he spoke to Sears, Plaintiff never contested the markdowns had taken place; rather, he stated that he had nothing to do with them and that the markdowns were Ms. Dugger's responsibility.

The court recognizes that Plaintiff disagrees with whether certain product was in certain locations at certain times.  For example, Ms. Dugger testified that there was markdown merchandise in the store during the inventory.  *See* Dugger Depo., at 82.  The court notes, however, that Ms. Dugger seems to be talking about markdown merchandise that had always been in Plaintiff's store as opposed to the merchandise transferred from the Decatur store and

then marked down to zero, which is apparently what troubled Sears and Mr. Hudson.

Furthermore, the court notes that Plaintiff avers after he was terminated some totes of hair

care products were located in his backroom.  *See* Response, ¶ 178.  However, the deposition

testimony of Thomas Stahelek, cited by Plaintiff, goes on to state that the five totes of

product found in the storeroom were not on the markdown sheets.  *See* Stahelek Depo., at

181-82.  In any event, none of these so-called "disputes" is material to what Sears had been

told at the time of termination by Plaintiff, Mr. Hudson, Ms. Glass, and Ms. Dugger

concerning the markdowns.

The dispute that Ms. Glass testified she never went to Plaintiff's store to actually look

for the inventory, but Sears recalls that she did, also is not material to whether Sears had a

good faith belief that Plaintiff took improper markdowns.  As explained above, Ms. Glass,

herself, told Sears that Plaintiff had done that.  Similarly, the court is puzzled by Plaintiff's

insistence that Sears' asking Ms. Glass to check the transfer sheets is "pure fabrication" as

conclusorily asserted in Plaintiff's Response, ¶ 180.  The court has reviewed each citation to

the record cited by Plaintiff and none supports this accusation.  Plaintiff appears to contend

that it is suspicious because "Sears knew on inventory day that the merchandise listed [on the

sheets checked by Ms. Glass] had been destroyed and thrown out."  *Id.*  Again, none of the

testimony supports this.  Rather, as illustrated through Mr. Hudson's testimony above (and

also cited by Plaintiff), the whole problem started because Sears expected to see marked

down merchandise in Plaintiff's store and did not.  He then asked Mr. Hudson to look into the

AO 72A
(Rev.8/82)

matter.  Plaintiff informed Sears and Mr. Hudson that $10,000 worth of markdowns to zero had taken place.  Mr. Hudson was extremely surprised by this figure.  Sears then asked Ms. Glass to look at Plaintiff's markdown sheets in conjunction with the transfer sheets for the items from the Decatur store.  Ms. Glass also informed Sears that some improper markdowns had taken place.  Nothing in any of this testimony indicates that Sears was sending people on a wild goose chase to investigate matters of which he already knew.  Rather, it supports Defendant's contention that on the day of inventory, no one understood why $10,000 worth of merchandise had been marked to zero.

Similarly – and another example of the problems with Plaintiff's responses addressed above – there is no dispute that Mr. Hudson specifically concluded that regular product in Plaintiff's store had been marked down to zero and destroyed and informed Sears of this fact. *See* Statement, ¶ 195.  Plaintiff's dispute of this fact is wrong.  *See* Response, ¶ 195. Plaintiff's extended "explanation" is irrelevant.  Whether some products may have made it through the markdown phase without being scanned addresses the factual issue of the markdown situation and not Sears' reasonable belief based on the information he was given by Mr. Hudson and Ms. Glass.  Further, the fact that Sears encouraged store managers to reduce the quantity of discounted merchandise prior to inventory is irrelevant.  Plaintiff, himself, specifically testified that Sears had not directed managers to do this in violation of the company's markdown policy.  *See* Copeland Depo., at 129-30.

37

Plaintiff raises several other facts in an attempt to demonstrate that Defendant's legitimate non-discriminatory reasons for termination were pretextual.   Plaintiff contends that he should not have been terminated, but rather suspended while loss prevention conducted an investigation.   As an initial matter, Plaintiff has not demonstrated that any particular policy of Defendant required this.   Furthermore, Plaintiff ignores the fact that he had just received a final written warning for his failure to properly prepare the store for inventory.

Next, Plaintiff asserts that only black managers were charged with "gross violations" and terminated for them.   Plaintiff avers that if an individual is terminated for a "gross violation" as opposed to a "violations of company policy," he is ineligible for re-hire. However, Plaintiff did not dispute Defendant's testimony that Sears has terminated four store managers for gross violations since January 2000, two of those individuals were white and two were black.   *See* Statements, ¶¶ 276-80.   Further, in 1998 and 2000, CVS terminated two white store managers for violating the markdown policy.   *See* Statements, ¶¶ 511-12.   The document Plaintiff cites for his proposition, Exhibit 7, Gross Violation Terminations, shows individuals terminated for "gross violations" and not simple violations of company policy. Exhibit 7 lists fourteen individuals terminated in 1999, two black employees and twelve white employees.   Later, Plaintiff argues that if white employees were terminated for violating the markdown procedure they were not listed as having committed "gross violations."

The bottom line is that Sears – as well as Ms. Glass and Mr. Hudson – had a good faith and reasonable belief at the time of Plaintiff's termination that Plaintiff had improperly

AO 72A
(Rev.8/82)

marked regular product down to zero and disposed of it in violation of company policy.   That

Plaintiff raises numerous issues after the fact as to whether the policy actually was violated

(although if it was, Plaintiff conveniently points to Ms. Dugger as having committed the act),

and whether five boxes of hair care products were located in his store room, is not material

to whether at the time of the termination, Sears in good faith believed that Plaintiff had

committed the violations.

### D.        Retaliation

As the court explained above, the most troubling aspect of Plaintiff's declaration filed

in response to Defendant's motion for summary judgment is his new assertion that during the

January 14, 2002 confrontation with Sears, he complained both about (1) the manner in which

Sears was addressing Ms. Dugger, as well as (2) the discriminatory nature of her proposed

transfer.   Specifically, Plaintiff now asserts that he "confronted him about his intension [sic]

to transfer her for no stated business reason against her will.  I felt then, as I do now, that this

too resulted from racial animus."   *See* Plaintiff's March 16, 2006, Affidavit, ¶ 9.   In contrast,

in his deposition, Plaintiff testified only he told Sears he "shouldn't be on the sales floor

talking to an associate like that."   *See* Copeland Depo., at 154.   When "we went on the sales

floor and I said to him, no, this is not the right time or right place to do this, then we went back

in the back and I asked him, Kent, would you do this to, you wouldn't stand in front of a white

lady or a white woman and treat her like you are treating this woman.   She is still a woman

regardless of her color, and you're treating her with – this is not the way we treat our

employees, and he didn't respond to what I had said to him." *Id.* at 156.  Because Plaintiff had specifically addressed the January 14, 2002 confrontation in his deposition and had throughout the period of discovery the opportunity fully to explain his feelings on the matter, the court will not now allow him to amend his allegations in this respect in an affidavit filed after the close of discovery and after Defendant filed its motion for summary judgment specifically relying on Plaintiff's previous version of events in its briefing.

> In one of his responses to Defendant's statements, Plaintiff's counsel avers,

> Plaintiff further states that he complained to Jon Roberts, a previous Area VP, and to numerous other district managers about the lack of career development opportunities for Black Store Managers as compared with their White counterparts.   Plaintiff states further that he also complained about disparities in assignments, and treatment of the Black versus the White managers.

Response, ¶ 265 (citing Copeland March 19, 2006 Affidavit, ¶¶ 17-18).   Even if the court were to accept this late-filed affidavit, these cited paragraphs do not support Plaintiff's counsel's statement.  Rather, Plaintiff testified:

> ¶ 17.   I have actively sought information about vacancies and opportunities to position myself for career advancement with CVS since 1998.  I have observed during that period of time that Black managers are almost exclusively assigned to high crime areas in predominantly ethnic neighborhoods where the shrink is high, the volume is low, and chances for advancement are non existant [sic].  By contrast White managers are almost always assigned to stores in neighborhoods that are predominantly White and middle or upper middle class.

> ¶ 18.    Within the last year of my employment with CVS I excelled in my management of store 4530 and I began to question my district managers more persistently about how to get myself considered for advancement in the company.  I either got no response to my inquiries or I got directed to retake another test.

40

*See id.*, ¶¶ 17-18.   There is nothing in Plaintiff's statements about speaking with Jon Roberts and other district managers.   There is nothing in this statement about complaining to anyone in management of disparities in the treatment of black versus white managers.   These omissions are obviously significant in a retaliation claim.   In order to succeed on such a claim, a plaintiff must show that a decisionmaker was aware of his protected activity. Plaintiff's new affidavit simply recites his own observations and makes no mention of whether he raised these observations with anyone in management at CVS, let alone Kent Sears.   (Again, the court notes that the Magistrate Judge accepted Plaintiff's testimony that shortly after Revco was acquired by CVS, Plaintiff participated in a focus group on racial concerns.   *See* Plaintiff's March 19, 2006 Affidavit, ¶ 12.   The Magistrate Judge found this event was too remote in time to be a cause of Plaintiff's termination and this court agrees.).   Furthermore, Plaintiff's general contention that "he had a history of questioning the total absence of any Black manager above the store manager level" or that he made comments about the absence of black managers in focus group meetings, is too speculative to constitute protected activity. Plaintiff provides no time frame or context for these "questionings," nor does he describe to whom these complaints allegedly were directed.   Without more, the court cannot even conduct a prima facie review of this supposed protected activity.

Finally, even if the court were to accept that Plaintiff could make out a prima facie case of retaliation based on his objection to the treatment of Ms. Dugger, for the reasons discussed in analyzing Plaintiff's termination claim, the court finds that Plaintiff cannot show

that Defendant's legitimate non-discriminatory reasons for termination – failure to prepare for inventory and improper markdown of merchandise – were pretextual.

For the foregoing reasons, the court ADOPTS the Report and Recommendation [192-1] of the Magistrate Judge as the ORDER of this court.   The court GRANTS Defendant's motion for summary judgment [129-1].

**III.   Conclusion**

The court ADOPTS the Report and Recommendation of Magistrate Judge Susan S. Cole [192-1] and GRANTS Defendant's motion for summary judgment [129-1].

**IT IS SO ORDERED** this 15th day of September 2006.

<u>      s/ J. Owen Forrester      </u>
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

42